TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office
ELI A. ALCARAZ (Cal. Bar No. 288594)
Assistant United States Attorney
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6938
    Facsimile: (951) 276-6202
    E-mail:    Eli.Alcaraz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 19-150(A)-PSG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION CONCERNING DEFENDANT CHARLEAN NICOLE SIMMONS |
| v. | |
| CHARLEAN NICOLE SIMMONS, | Hearing Date: January 28, 2022 Hearing Time: 10:00 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Philip S. Gutierrez |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Eli A. Alcaraz, files its sentencing position concerning defendant Charlean Nicole Simmons.

    This sentencing position is based on the attached memorandum of points and authorities; the files and records in this case, including the United States Probation and Pretrial Services Office's Presentence Investigation Report and Recommendation Letter (Dkts. 50, 51); and such further evidence and argument as the Court may permit.

The United States respectfully requests the opportunity to supplement its position or respond to defendant or the Probation Office as may become necessary.

Dated: January 14, 2022          Respectfully submitted,

                                 TRACY L. WILKISON
                                 United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 JERRY C. YANG
                                 Assistant United States Attorney
                                 Chief, Riverside Branch Office

                                 _____
                                 ELI A. ALCARAZ
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**DESCRIPTION**                                                              **PAGE**

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................2

III.  THE PRESENTENCE INVESTIGATION REPORT........................4

      A.   OFFENSE LEVEL..........................................4

      B.   CRIMINAL HISTORY CATEGORY..............................4

      C.   PROBATION'S RECOMMENDED SENTENCE.......................5

IV.   THE UNITED STATES' POSITION ON THE PRESENTENCE
      INVESTIGATION REPORT AND RECOMMENDATION LETTER..............5

V.    THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a)
      ANALYSIS....................................................8

      A.   NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE..9

      B.   DEFENDANT'S HISTORY AND CHARACTERISTICS...............14

      C.   NEED TO PROTECT THE PUBLIC, TO PROVIDE ADEQUATE
           DETERRENCE AND JUST PUNISHMENT, AND TO PROMOTE RESPECT
           FOR THE LAW...........................................17

      D.   TEN YEARS OF SUPERVISION ARE NECESSARY................19

VI.   CONCLUSION.................................................20

i

<u>**TABLE OF AUTHORITIES**</u>

**FEDERAL CASES**                                                    **PAGE**

<u>District of Columbia v. Heller</u>,
  554 U.S. 570 (2008) ........................................ 11

<u>Scarborough v. United States</u>,
  431 U.S. 563 (1977) .................................... 11, 12

<u>United States v. Dillard</u>,
  214 F.3d 88 (2d Cir. 2000) ................................ 11

<u>United States v. Gomez</u>,
  6 F.4th 992 (9th Cir. 2021) .............................. 6, 7

<u>United States v. Huddleston</u>,
  415 U.S. 814 (1974) ....................................... 11

<u>United States v. Nelson</u>,
  222 F.3d 545 (9th Cir. 2000) ............................... 6

**FEDERAL STATUTES**
18 U.S.C. § 3553 ..................................... (passim)

21 U.S.C. § 801....................................... 9

21 U.S.C. § 841....................................... 19

**CODE OF FEDERAL REGULATIONS**
28 C.F.R. § 550.55.................................... 20

**UNITED STATES SENTENCING GUIDELINES**
U.S.S.G. § 1B1.3 ..................................... 7

U.S.S.G. § 2D1.1 ..................................... 4, 6

U.S.S.G. § 3E1.1 ..................................... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Charlean Nicole Simmons ("defendant"), a recidivist now 10-time-felon with over two decades of criminal history garnering 21 criminal history points, possessed with intent to distribute and distributed a total of 702.53 grams of actual methamphetamine. During the times that she possessed with intent to distribute methamphetamine, she brought minor girls with her and at least once directed one of the minors to conceal defendant's crime.  Further, she did not just sell methamphetamine, she also sold a firearm to a confidential informant ("CI") during a drug deal.  For her conduct, defendant stands convicted of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

On December 22, 2021, the United States Probation and Pretrial Services Office ("Probation") filed its Recommendation Letter ("RL," Dkt. 50) and Presentence Investigation Report ("PSR," Dkt. 51).  The PSR calculated a total Guidelines offense level of 33 and a Criminal History Category of VI, based on 21 points, resulting in a Guidelines range of 235-293 months' imprisonment.  (PSR ¶¶ 23-36, 42-55, 117.) While Probation concludes that the seriousness of the offense is increased because defendant also sold a firearm during a drug transaction, that defendant has shown a very low level of respect for the law, and that the public needs to be protected from defendant (RL at 4, 5), after its assessment of the § 3553(a) factors, it recommends a 67-month downward variance (the equivalent of three offense levels) to a sentence of 168 months' imprisonment.  As set forth below, the United States agrees, on balance, that a 168-month sentence is appropriate.

With the exception of the length of the term of supervised release, the United States agrees with Probation's recommended sentence and respectfully requests that the Court sentence defendant to: (1) 168 months' imprisonment, (2) a 10-year period of supervised release (Probation recommends five years), (3) a $100 mandatory special assessment, and (4) that all fines be waived.  At a time before sentencing, the United States intends to seek forfeiture as alleged in the First Superseding Indictment ("FSI," Dkt. 41) and agreed to in the Plea Agreement ("Plea," Dkt. 45 ¶ 3).

This sentence is sufficient and no greater than necessary to accomplish the goals of sentencing and fairly balances the nature, circumstances, and seriousness of the offense; protecting the public; providing deterrence; and promoting respect for the law with defendant's history and characteristics, among other considerations.

## II.  FACTUAL BACKGROUND

The following is a summary of the facts in the PSR (see PSR ¶¶ 12-17, 24, 28, 37-38) as well as the factual basis of the Plea Agreement (¶ 14), which defendant admitted during her October 8, 2021 change of plea hearing (Dkt. 49).  Defendant became a focus for law enforcement following surveillance on her home in Riverside County, where authorities noticed "activity includ[ing] subjects arriving on foot and in vehicles, entering the residence and leaving shortly afterward" (PSR § 12), which are indications drug sales were occurring within the home.

On May 10, 2018, law enforcement saw defendant going in and out of her car, before getting inside it with a 14-year-old girl and driving away from her home.  (PSR ¶ 13.)  Law enforcement pulled over defendant and arrested her under an outstanding misdemeanor arrest

warrant.  (PSR ¶ 13; Plea ¶ 14.)  During the arrest, defendant "was aggressive with the female arresting officer."  (PSR ¶ 37.)  Also during the arrest, defendant yelled to the minor female to make sure the minor grabbed defendant's purse and backpack from the trunk and walk them around the corner, back to defendant's residence.  (PSR ¶ 13.)  Law enforcement seized the purse and backpack and learned defendant had in those items multiple bags of methamphetamine, which totaled 113.1 grams of actual methamphetamine, as well as over $600 in cash.  (PSR ¶ 13; Plea ¶ 14.)  Defendant admitted that she intended to distribute that methamphetamine to at least one other person.  (Plea ¶ 14.)  Following the arrest, law enforcement recorded an interview with defendant, during which she told the case agent, "I really want to fight [the female arresting officer] right now.  Like I really want to punch her in her face and give her exactly what she is lacking, which is me nutting all over her face after I whoop her ass."  (PSR ¶ 37.)  Defendant also told the case agent, "I'm on a suicide mission and I have nothing to live for anymore."  (PSR ¶ 37.)

Before March 26, 2019, defendant agreed to sell a CI methamphetamine and a firearm.  (PSR ¶ 14; Plea ¶ 14.)  On March 26, 2019, the CI met defendant at her home, where she sold the CI 6.14 grams of actual methamphetamine for $650 and a Hi-Point model C9, 9 mm Lugar semiautomatic pistol and 58 rounds of ammunition for $600.  (PSR ¶ 14; Plea ¶ 14.)  Later that day, to complete their agreed to drug deal, defendant sold the CI 450.42 grams of actual methamphetamine for $1,460.  (PSR ¶ 15; Plea ¶ 14.)

Before May 9, 2019, defendant agreed over texts and phone calls to sell the CI more methamphetamine.  (PSR ¶ 16.)  They also discussed the possibility of her selling the CI additional firearms.

3

(PSR ¶ 16.)  On May 9, 2019, while preparing to complete the drug deal, defendant left her home in her car with two minor girls.  (PSR ¶ 16.)  Law enforcement pulled over defendant and arrested her.  (PSR ¶ 16; Plea ¶ 14.)  Defendant had a backpack with her and inside was 132.87 grams of actual methamphetamine and a single round of ammunition.  (PSR ¶ 16; Plea ¶ 14.)  Defendant admitted that she intended to distribute that methamphetamine.  (Plea ¶ 14.)

In total, the amount of actual methamphetamine that defendant possessed with intent to distribute and distributed on May 10, 2018, March 26, 2019, and May 9, 2019, is 702.53 grams of actual methamphetamine.  (PSR ¶ 17; Plea ¶ 14.)

## III.  THE PRESENTENCE INVESTIGATION REPORT

On December 22, 2021, Probation issued its Recommendation Letter and disclosed the PSR to the parties.  (Dkts. 50, 51.)

### A.  OFFENSE LEVEL

In the PSR, Probation concluded that the appropriate offense level is 33.  Probation's offense level calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 34 | [U.S.S.G. §§ 2D1.1(a)(5), (c)(3)] |
| Dangerous Weapon (including Firearm) Possessed: | +2 | [U.S.S.G. § 2D1.1(b)(1)] |
| Acceptance of Responsibility: | -3 | [U.S.S.G. §§ 3E1.1(a), (b)] |
| _____ | | |
| TOTAL: | 33 | |

(PSR ¶¶ 23-36.)

### B.  CRIMINAL HISTORY CATEGORY

The PSR concluded that defendant is in Criminal History Category VI because of a criminal history score of 21.  (PSR ¶¶ 42-55.)  In its Recommendation Letter, Probation asserted that a "strong argument

4

1  can be made that reliable information indicates that Simmons'

2  criminal history category under-represents the seriousness of her

3  criminal history or the likelihood that she will commit more crimes."

4  (RL at 5.)

5       **C.   PROBATION'S RECOMMENDED SENTENCE**

6       The Guidelines range for a total offense level of 33 with

7  Criminal History Category VI is 235-293 months.  (PSR ¶ 117.)

8       In its Recommendation Letter, Probation recommended the

9  following sentence: (1) 168 months' imprisonment (which is a three-

10  level downward variance from the low end of the calculated range),

11  (2) a five-year period of supervised release, (3) a $100 mandatory

12  special assessment, (4) forfeiture (which the United States plans to

13  seek in a separate filing), and (5) that all fines be waived.  (RL at

14  1-3.)

15  **IV.  THE UNITED STATES' POSITION ON THE PRESENTENCE INVESTIGATION
      REPORT AND RECOMMENDATION LETTER**

16

17       <u>Overall:</u>  The United States concurs with Probation's Guidelines

18  and Criminal History calculations.  It has no legal objections to the

19  PSR.

20       <u>Factual Correction:</u>  It appears that there is a typographical

21  error in paragraph 16 of the PSR.  The final two sentences of that

22  paragraph say, "Simmons had a backpack while driving the car and, in

23  the backpack, she possessed 132.87 grams of actual methamphetamine.

24  Simmons also possessed a single round of <u>methamphetamine</u>."  (emphasis

25  added.)  Based on the topics in these sentences, and the 18 U.S.C.

26  § 922(g)(1) charge in Count 6 of the FSI that applies to this

27  conduct, the United States believes that the second reference to

28  "methamphetamine" in the quote should be changed to "ammunition."

1    <u>Support for Upward Adjustment Under § 2D1.1(b)(1)</u>:   The United

2   States provides the following additional support justifying the two-

3   level upward adjustment under Guidelines § 2D1.1(b)(1) for Possession

4   of a Dangerous Weapon (Including a Firearm) (PSR ¶¶ 27-28).

5    Application Note 11(a) to § 2D1.1 says the "[e]nhancement for

6   weapon possession in subsection (b)(1) reflects the increased danger

7   of violence when drug traffickers possess weapons."  "The enhancement

8   should be applied if the weapon was present, unless it is <u>clearly</u>

9   <u>improbable</u> that the weapon was connected with the offense."  <u>Id.</u>

10   (emphasis added).  Once it has been established that a defendant

11   possessed a dangerous weapon--as it has been here (PSR ¶¶ 14, 28)--it

12   becomes defendant's burden to show that the firearm's connection with

13   the offense was "clearly improbable."  <u>United States v. Nelson</u>, 222

14   F.3d 545, 549 (9th Cir. 2000).

15    Here, during the first drug sale on March 26, 2019 (Counts 2 & 3

16   of the FSI), defendant sold 6.14 grams of methamphetamine at the same

17   time that she sold a firearm and ammunition to the CI.  (PSR ¶¶ 14,

18   28.)  The Ninth Circuit has reviewed applicability of the two-level

19   enhancement under § 2D1.1(b)(1) when a defendant sells both a gun and

20   drugs at the same time, and determined that a district court does not

21   err when it applies the enhancement where the sale of a firearm and

22   methamphetamine are bundled together.  In <u>United States v. Gomez</u>, 6

23   F.4th 992 (9th Cir. 2021), the Ninth Circuit explained that "[w]e

24   heave interpreted the § 2D1.1(b)(1) enhancement broadly" and have

25   "also interpreted . . . application note [11] broadly."  <u>Id.</u> at 1008-

26   09.  "In determining whether the weapon was connected with the

27   offense, we have concluded 'offense" in this context refers to 'the

28   entire course of criminal conduct,' not just the crime of

6

conviction." <u>Id.</u> at 1009 (streamlined).[1] "This is consistent with the broad language of § 1B1.3, which provides that specific offense characteristics such as § 2D1.1(b)(1) take into account all acts and omissions that occurred 'during the commission of the offense of conviction, in preparation of that offense, or in the course of attempting to avoid detection or responsibility of that offense." <u>Id.</u> (quoting U.S.S.G. § 1B1.3(1)(B)).

In <u>Gomez</u>, the enhancement was applied where the defendant sold "the firearm and the methamphetamine at the same time." <u>Id.</u> Specifically, "[d]uring [a] February 17 transaction, Gomez possessed a firearm to sell to [the purchaser], and the weapon was present during the drug trafficking offense." <u>Id.</u> at 1010. "[T]he firearm . . . was connected to the offense, because the sale of the firearm and methamphetamine were bundled together. Under our case law, the government does not have to establish that the defendant possessed the firearm for the purpose of protecting or facilitating the drug transaction." <u>Id.</u> The <u>Gomez</u> court held that the district court did not err when it imposed the two-level enhancement under § 2D1.1(b)(1) when the firearm and methamphetamine were sold together. <u>Id.</u>

The two-level upward adjustment under § 2D1.1(b)(1) applies here because (1) defendant negotiated a package deal of methamphetamine and a firearm, and (2) defendant actually sold a gun and methamphetamine at the same time. As the PSR states, "the contraband

---

[1] Consistent with this approach, the PSR states that the "behavior involving Simmons' sale of a firearm and the total amount of methamphetamine sold or possessed with intent to be distributed, are considered relevant conduct because it is part of the same course of conduct or common scheme or plan as the offenses of conviction, and the offense of conviction is of a character for which USSG § 3D1.2(d) would require grouping [of] multiple counts." (PSR ¶ 24 (citing U.S.S.G. § 1B1.3(a)(2)).)

1    sold together in one transaction indicates that the weapon was very

2    much connected to the offense." (PSR ¶ 28.) Because defendant

3    cannot carry her burden to show that the possession of the gun in

4    connection with the offense was <u>clearly improbable</u>, the Court should

5    apply the upward adjustment.

6    **V.   THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a) ANALYSIS[2]**

7         The United States recommends the following sentence: (1) 168

8    months' imprisonment (which is a three-level downward variance from

9    the low end of the calculated range, totaling 67 months), (2) a 10-

10   year period of supervised release (Probation recommends five years),

11   (3) a $100 mandatory special assessment, and (4) that all fines be

12   waived. At a time before sentencing, the United States intends to

13   seek forfeiture as alleged in the First Superseding Indictment and

14   agreed to in the Plea Agreement.

15        This sentence is sufficient and no greater than necessary to

16   accomplish the goals of sentencing and fairly balances the nature,

17   circumstances, and seriousness of the offense; protecting the public;

18   providing deterrence; and promoting respect for the law with

19   defendant's history and characteristics, among other things.

20   _____

21        [2] The discussion in this brief of how the § 3553(a) factors
     apply in this case is meant to support the United States' request for
22   a sentence of 168 months' imprisonment. Nothing in this sentencing
     position should be construed as recommending or suggesting that a
23   sentence of more than 168 months is appropriate under the § 3553(a)
     factors. The United States anticipates that defendant will seek an
24   even greater variance below the Guidelines range because of
     defendant's history and characteristics, among other things. While
25   there is mitigation present in defendant's history and
     characteristics, that mitigation has already been carefully
26   incorporated into the United States' recommended sentence, which
     includes an over five-and-one-half year downward variance from the
27   Guidelines range to 168 months. Aggravating information discussed is
     intended only to highlight the appropriateness of the recommended
28   168-month sentence, and in so doing make clear that a lesser
     custodial sentence would not be appropriate in this case.

                                      8

1         **A.   NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE**

2       Defendant's conduct is exceedingly serious, created general and

3 specific danger to the community, highlighted her potential for

4 violence, and put multiple minor girls in harm's way.  A 168-month

5 sentence appropriately reflects the nature, circumstances, and

6 seriousness of the offense.

7       <u>Defendant's Conduct is Exceedingly Serious and Created a Danger</u>

8 <u>to the Community:</u>  Over multiple events, defendant possessed with

9 intent to distribute and distributed a total of 702.53 grams of

10 actual methamphetamine.  (PSR ¶¶ 13-17.)  According to Probation,

11 (1) the "instant offense is quite serious," (2) the "amount of drugs

12 is quite large, leading to a base offense level of 34, the third

13 highest base offense level under the Drug Quantity Table," and

14 (3) "Congress has made clear that drug crimes are to be punished

15 sternly."  (RL at 4, 5.)  Indeed, three of the drug trafficking

16 counts in the FSI presumptively apply a 10-year mandatory minimum

17 sentence (Counts 1, 4, 5) and a different drug trafficking count

18 presumptively applies a five-year mandatory minimum sentence (Count

19 2).  (Dkt. 41.)  Said another way, defendant admitted to a factual

20 basis supporting four separate crimes with mandatory minimum

21 sentences.  (Plea ¶ 14.)

22       Further, drugs endanger the community as a whole and pose a

23 significant risk to the country's justice and healthcare systems.

24 "The illegal importation, manufacture, distribution, and possession

25 and improper use of controlled substances have had a substantial and

26 detrimental effect on the health and general welfare of the American

27 people."  21 U.S.C. § 801(2).  Drug trafficking has had a

28 particularly devastating impact in the Central District of

California.  For example, in 1990, the Los Angeles area (including Los Angeles, Orange, Riverside, and San Bernardino Counties) was among the first areas designated as a High Intensity Drug Trafficking area.[3]  "The increased use [of methamphetamine] has led to devastating effects on individuals and the community[.]" COMPREHENSIVE METHAMPHETAMINE CONTROL ACT OF 1996, PL 104-237, October 3, 1996, 110 Stat 3099.  The increase in methamphetamine use has led to a corresponding increase "in the number of violent crimes" and "a dramatic increase in deaths."  Id.

Before this case, defendant gained a specific understanding of the danger and seriousness of distributing methamphetamine.  In 2011, she sustained a drug trafficking conviction where, like here, she sold methamphetamine to a CI.  (PSR ¶ 52.)  For that conduct, she received a five-year sentence of imprisonment and then an additional 454 days in jail for violating her probation.  (PSR ¶ 52.)  Defendant understood the seriousness of drug trafficking for years leading up to the conduct here, yet engaged in it anyway multiple times.

Possession and Sale of a Firearm Increased the Seriousness and Danger:  As Probation assessed, "[i]ncreasing the seriousness of the offense, is Simmons' sale of a firearm."  (RL at 4.)  The United States agrees.  "The sale of drugs and firearms puts the community at risk."  (RL at 5.)  Unsurprisingly, the presence of a firearm in criminal conduct increases the likelihood of death and intensifies violence.  Philip J. Cook, et al., Gun Control After Heller: Threats

---

[3] See Executive Office of the President Office of National Drug Control Policy, High Intensity Drug Trafficking Areas Program Report to Congress (2015), https://obamawhitehouse.archives.gov/sites/default/files/ondcp/about-content/Congressional/hidta_program_2015_report_to_congress.pdf.

and Sideshows from a Social Welfare Perspective, 56 UCLA. L. Rev.
1041, 1073-74 (2009).

Further, at the time of the criminal conduct, defendant was a
nine-time felon (PSR ¶¶ 42, 45, 47-53), so she was not permitted in
the first place to possess the gun and ammunition she sold during a
transaction with the CI.  "The principal purpose of the federal gun
control legislation . . . [is] to curb crime by keeping firearms out
of the hands of those not legally entitled to possess them because of
age, criminal background, or incompetency."  United States v.
Huddleston, 415 U.S. 814, 824 (1974) (internal citation omitted);
Scarborough v. United States, 431 U.S. 563, 572 (1977) ("The
legislative history [of a prior felon-in-possession statute] in its
entirety, while brief . . . supports the view the Congress sought to
rule broadly to keep guns out of the hands who have demonstrated that
'they may not be trusted to possess a firearm without becoming a
threat to society.'"); see also District of Columbia v. Heller, 554
U.S. 570, 626 (2008) (recognizing the longstanding prohibition on the
possession of firearms by felons is consistent with the Second
Amendment).  Accordingly, the felon-in-possession prohibitions that
applied to defendant during the entire course of her criminal conduct
here "seek[] to protect society by reducing the risk of violence that
may result from the possession of guns by persons inclined to crime,"
so in violating these laws, felons "increase the risk that they may
engage in violent acts."  See United States v. Dillard, 214 F.3d 88,
93 (2d Cir. 2000).

To acquire the firearm and ammunition that defendant sold, she
necessarily evaded a network of laws and regulations designed to keep
firearms away from her because she poses an unacceptable threat to

11

1  society.  See Scarborough, 431 U.S. at 573.  In seeking a gun when

2  defendant cannot otherwise lawfully possess one, she created demand

3  in an unlawful marketplace and increased danger in the community.

4       Defendant Highlighted Her Potential for Violence:  During one of

5  defendant's interactions with the CI, as recounted by the CI, she

6  told the CI that she had a pending child endangerment case (which is

7  actually a felony willful child cruelty case (PSR ¶ 59)) and that she

8  planned to kill the person who reported her regarding the case.  (PSR

9  ¶ 38.)  The CI explained that defendant said the person who reported

10  the case liked to drink alcohol and that defendant planned to spike

11  the reporting party's drink with a certain kind of acid and then give

12  the drink to the reporting party.  (PSR ¶ 38.)  As the CI further

13  reported, defendant believed there would be no way the reporting

14  party's death could be traced back to defendant.  (PSR ¶ 38.)  The

15  Court can feel comfortable being wary of defendant and giving

16  credence to what she told the CI because there is other evidence in

17  the record to highlight her potential for violence.

18       During her arrest on May 10, 2018, as recorded by a body worn

19  camera, defendant "was aggressive with the female arresting officer."

20  (PSR ¶ 37.)  Her anger did not dissipate--once she was arrested and

21  transported to the station for processing, she told the case agent

22  during her Mirandized, recorded interview, "I really want to fight

23  that woman right now.  Like I really want to punch her in her face

24  and give her exactly what she is lacking, which is me nutting all

25  over her face after I whoop her ass."  (PSR ¶ 37.)  She also

26  reiterated to the case agent during that interview--"I'm on a suicide

27  mission and I have nothing to live for anymore."  (PSR ¶ 37.)

28

Defendant's threats and actions support the United States' requested 168-month sentence.

   Defendant Put Multiple Minor Girls in Harm's Way:  During the course of her criminal conduct, defendant put children at risk and her sentence should reflect that.  "While the presence of children in her car with methamphetamine are not counted in the offense level calculation, their presence certainly is a factor in aggravation."  (RL at 4.)

   Specifically, on May 10, 2018, when defendant left her home with 113.1 grams of actual methamphetamine that she intended to distribute, she brought a 14-year-old in the car with her.  (PSR ¶ 13.)  Not only that, when defendant was being arrested that day, she enlisted the minor to help conceal defendant's crime. Specifically, defendant yelled to the minor female to make sure the minor grabbed defendant's purse and backpack from the trunk and walk them around the corner, back to defendant's residence.  (PSR ¶ 13.) Then, approximately one year later on May 9, 2019, after the CI and defendant agreed to another drug sale, defendant left her home, again with over 100 grams of actual methamphetamine, but this time with two minor girls.  (PSR ¶ 16.)  The home that defendant left on these two occasions with methamphetamine and minor girls is the same location where defendant sold methamphetamine and a gun to the CI on March 26, 2019.  (PSR ¶¶ 14-15.)  Defendant put minors in harms' way, which is aggravation here.

   The nature, circumstances, and seriousness of the offense support the 168-month sentence requested by the United States.

1

      **B.   DEFENDANT'S HISTORY AND CHARACTERISTICS**

2       Defendant's history and characteristics occupy both ends of the

3 scale.  There is meaningful mitigation.  There is unaccounted for

4 aggravation.  The United States has considered the complex positive

5 and negative factors at issue in this case and its careful balancing

6 is represented in the request for a 168-month sentence.  Aggravation

7 here cannot be overlooked, and a 168-month sentence is also an

8 appropriate increase in a custodial sentence compared to the

9 sentences previously imposed on defendant.  In recommending a three-

10 level downward variance that equates to 67 months below the

11 Guidelines range, the United States seriously considered the

12 appropriate result in this case.

13       <u>Mitigation:</u>  As Probation noted, defendant's personal history

14 has various types of mitigation and generally shows "the devastation

15 that stems from abuse and neglect."  (RL at 5.)

16       Defendant reports that as a three- or four-year-old, she

17 suffered awful abuse by her father, which may have led to his

18 deportation.  (PSR ¶ 76.)  She then suffered even more traumatic

19 abuse as a seven-year-old at the hands of her step-brother.  (PSR

20 ¶ 78.)  Unconscionably, her step-brother was permitted to return to

21 the same home as defendant following two years at a boy's facility

22 for his conduct.  (PSR ¶ 78.)  In the same traumatic vein, defendant

23 suffered the same type of abuse at age 14 (PSR ¶ 84) and then through

24 her teenage years at the hands of older men when she was either in

25 foster care or on the streets.  (PSR ¶ 85).  No one should experience

26 this type of abuse, let alone with the frequency reported by

27 defendant.

28

1    One would hope that in the face of such harm at the hands of men

2    that defendant would have the support and love of her mother.  Her

3    mother, though, as confirmed by defendant's sister, abused drugs and

4    struggled with mental illness.  (PSR at 20 n.2, ¶ 77.)  Her mother

5    blamed defendant for problems with her mother's marriage to her step-

6    father.  (PSR ¶ 79.)  Money was limited because of defendant's

7    mothers' jobs, and defendant remembers being undernourished while her

8    mother would serve her stepfather full meals.  (PSR ¶ 80.)

9    Defendant's mother was also physically abusive--defendant says she

10   was a "human punching bag"--until defendant once hit back.  (PSR

11   ¶ 81.)  When not in a home with underperforming parents, defendant

12   spent time in foster care and on the streets.  (PSR ¶¶ 80, 85.)  This

13   is the type of history that might account for aspects of her lengthy

14   (and overall aggravating) criminal history.

15   Additionally, defendant reports being diagnosed with a serious

16   mental health disorder for which she has been prescribed medication.

17   (PSR ¶ 88.)  Abuse in her past has led her to seek out counseling

18   services.  (PSR ¶ 96.)  Her mental health has fluctuated.  (PSR

19   ¶¶ 96-99.)  Defendant also reports having several physical health

20   problems that she can manage through medication.  (PSR ¶ 95.)

21   Drugs and alcohol abuse appear to have had a long and negative

22   impact on defendant.  (PSR ¶¶ 83, 100-104.)  This is the type of

23   history that might account for aspects of her criminal history.

24   There are positives in defendant's life.  Impressively, after

25   the birth of her youngest child, defendant weaned herself off drugs.

26   (PSR ¶ 89.)  She also previously used time in custody to her

27   advantage to earn her GED.  (PSR ¶ 89.)  Defendant should be

28   commended for these actions that appear self-motivated.

1    All this being said, Probation correctly comments that

2 defendant's mitigation "does not absolve Simmons from her conduct"

3 because "she willfully undertook her conduct in the instant offense."

4 (RL at 6.)

5    <u>Aggravation:</u>  Before this case, defendant had nine felony

6 convictions and five misdemeanor convictions between 1999 and 2011.

7 (PSR ¶¶ 42-53.)  Probation determined defendant "continuously was

8 under some sort of criminal justice sentence from 1999 to 2016."  (RL

9 at 5.)  She has amassed 21 criminal history points (despite having

10 sustained five convictions as an adult and two as a minor that earn

11 no criminal history points).  (PSR ¶¶ 40-41, 43-46, 52, 55.)  While

12 certain convictions did not garner criminal history points, defendant

13 still managed to surpass 13 criminal history points (which place her

14 in Criminal History Category VI).  She has eight points that are not

15 accounted for in her Guidelines range and should factor into the

16 Court's sentence.  Probation put it succinctly--"A strong argument

17 can be made that reliable information indicates that Simmons'

18 criminal history category under-represents the seriousness of her

19 criminal history or the likelihood that she will commit more crimes."

20 (RL at 5.)

21    In further aggravation, defendant's convictions include harm and

22 damage that affect not just herself.  She has a felony conviction for

23 impersonating another to make them liable (PSR ¶ 48) and a felony

24 conviction for tampering with a sprinkler in jail and setting it off

25 when there was no fire (PSR ¶ 50).  Also, as noted, defendant has a

26 prior drug trafficking felony conviction for selling methamphetamine.

27 (PSR ¶ 52.)

28

16

A 168-month sentence is an appropriate increase over prior sentences that defendant has received.  For defendant's first felony conviction, she was initially sentenced to diversion.  (PSR ¶ 42.) For defendant's other felony convictions, when not including time imposed for things like probation revocations, she has been sentenced to custody as low as 42 days and as high as five years.  (PSR ¶¶ 45-53.)  Because of probation revocations, she has served additional time on at least seven of her convictions.  (PSR ¶¶ 42, 43, 45, 47, 51-53.)  Given the number of prior sentences and their lengths, along with defendant's continued criminality, defendant's sentence here should be significant and appropriately higher than her prior sentences.

The sentence that appropriately considers defendant's history and characteristics is 168 months' imprisonment.

### C.   NEED TO PROTECT THE PUBLIC, TO PROVIDE ADEQUATE DETERRENCE AND JUST PUNISHMENT, AND TO PROMOTE RESPECT FOR THE LAW

Protecting the public, providing adequate deterrence and just punishment, and promoting respect for the law are paramount concerns and should factor in heavily in the Court's § 3553(a) analysis.

The community needs protection from defendant.  As explained, defendant's possession with intent to distribute and distribution of methamphetamine make the community less safe.  The dangers associated with drug trafficking are exacerbated by a nine-time felon working outside of legal channels to obtain and sell firearms.  Defendant's ties to firearms are not new.  She violated probation on her first felony conviction for, among other things, possessing a firearm. (PSR ¶ 42.)  As probation concluded, "[p]ublic protection is a concern with this defendant and the recommended sentence will serve

17

1  that purpose.  Simmons has proved to be a danger to the public. . . .

2  The sale of drugs and firearms puts the community at risk."  (RL at

3  5.)

4       Also, specifically in this case as well as in defendant's past,

5  she has put minors at risk.  Bringing minors when she planned to

6  distribute methamphetamine and instructing them to hide criminal

7  conduct puts their futures in jeopardy.  Selling drugs and guns from

8  a house where minors have been present poses a risk to them.  Also,

9  defendant is currently facing a felony case for willful child

10  cruelty.  (PSR ¶ 59.)  According to the PSR, defendant is alleged to

11  have inflicted unjustifiable physical pain and mental suffering on

12  her youngest daughter between July 28, 2013 to January 4, 2017.  (PSR

13  ¶ 59.)  As set forth in the PSR, the declaration in support of the

14  arrest warrant reflects that defendant's daughter (who was

15  approximately three years old in January 2017) had extensive linear

16  scars on her upper and lower extremities and several patterned scars

17  (known as loop marks) on her left thigh and leg.  (PSR ¶ 59.)  Her

18  child also had two linear burns on her lower back and right hand that

19  were healing and the child said some of the injuries were from when

20  "mommy hit me with [a] belt."  (PSR ¶ 59.)  Probation wrote that the

21  "details of the allegations of her own infliction of child abuse are

22  chilling."  (RL at 6.)  This does not appear to be an isolated event.

23  Child protective services also removed a different child from

24  defendant's care when defendant was 22 years old.  (PSR ¶ 86.)  The

25  significant sentence recommended, which is still a below-Guidelines

26  sentence, will address aggravation present here concerning minors.

27       The Court's sentence should consider specific and general

28  deterrence.  A sentence below 168-months will not deter defendant in

light of her decades-long criminal history and long history of probation violations.  A 168-month sentence would also have the added benefit of general deterrence for multi-time felons who have more than one drug trafficking conviction, who have flouted gun laws, and who have a track record of probation violations and recidivism.

The number of defendant's convictions and that there are eight criminal history points that do not impact her sentence show that Probation is correct in concluding defendant "has a very high rate of recidivism."  (RL at 5.)  Probation also appropriately determined that defendant "has shown a very poor level of respect for the law." (RL at 5.)  Defendant is 40 years old and has more than two decades of criminal history that has been exacerbated by probation violations.  The requested sentence will help impress upon defendant the need to make a lasting change, to interrupt the cycle that the sentences on her prior 14 convictions have been unable to do.

**D.   TEN YEARS OF SUPERVISION ARE NECESSARY**

There are many reasons why the Court should impose 10 years of supervised release, which include the following list.

First, defendant's numerous convictions, decades long criminal history, and Probation's conclusion that she has a high rate of recidivism show a need for lengthy supervision.

Second, the additional time above the five years of supervision required by statute (21 U.S.C. § 841(b)(1)(A)) will help defendant with her mental health and sobriety.  Defendant reports that when she is not in custody, she frequently stops taking mental health medications and returns to street drugs and that she has a "poor track record" of taking her medication when not on supervision.  (PSR ¶¶ 88, 97.)  Concerning sobriety, on at least three prior occasions

19

1    (PSR ¶¶ 42, 47, 51) defendant was ordered to participate in some sort
2    of drug treatment program, but she has been unsuccessful because she
3    chose not to participate.  The record shows that additional time with
4    federal supervision should help with her mental health treatment and
5    sobriety.[4]

6         Third, the recommended custodial sentence is a 67-month
7    reduction from the low end of the Guidelines range.  Because she
8    would not have those additional years in custody with access to
9    services and support, she should have additional years outside of
10   custody with access and support through supervision.  As Probation
11   wrote, "during her imprisonment and term of supervised release,
12   Simmons will have an opportunity to achieve a measure of holistic
13   rehabilitation."  (RL at 6.)

14        A 10-year period of supervised release, under the circumstances
15   here, is necessary to give defendant the best chance of success
16   reintegrating into and becoming a productive member of society.

17   **VI.   CONCLUSION**

18        For the foregoing reasons, the United States respectfully
19   requests that the Court impose the following sentence: (1) 168
20   months' imprisonment, (2) a 10-year period of supervised release,
21   (3) a $100 mandatory special assessment, and (4) that all fines be

---

23   [4] Defendant asserts that she is interested in a drug treatment
     program with the Bureau of Prisons.  (PSR ¶ 105.)  Probation
24   recommends that this Court recommend that defendant participate in
     RDAP.  (RL at 1.)  Based on defendants very lackluster commitment and
25   success with drug abuse programs when she is outside of custody, the
     recommended 168-month sentence has the added benefit of giving her
26   sufficient time to embrace sobriety in a controlled environment.

27        It appears that participation in RDAP could benefit defendant's
     sobriety without putting the community in harms ways through early
     release.  That is, defendant is ineligible for early release under
28   RDAP due to the offense involving a firearm.  See 28 C.F.R.
     § 550.55(b)(5)(ii).

                                   20

waived.   Further, at a time before sentencing, the United States
intends to seek forfeiture as alleged in the First Superseding
Indictment.